UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| J.W.S.,<br><br>    Plaintiff,<br><br> vs.<br><br>FRANK BISIGNANO, COMMISSIONER<br>OF SOCIAL SECURITY;<br><br>    Defendant. | 4:25-CV-04062-VLD<br><br><br>MEMORANDUM OPINION<br>AND ORDER |

**INTRODUCTION**

Plaintiff, J.W.S., seeks judicial review of the Commissioner's final

decision denying his application for social security disability benefits under

Title II of the Social Security Act.[1]  Mr. S. has filed briefs seeking to reverse the

---

[1]SSI benefits are called "Title XVI" benefits, and SSD/DIB benefits are called "Title II" benefits.  Receipt of both forms of benefits is dependent upon whether the claimant is disabled.  The definition of disability is the same under both Titles.  The difference—greatly simplified—is that a claimant's entitlement to SSD/DIB benefits is dependent upon one's "coverage" status (calculated according to one's earning history), and the amount of benefits are likewise calculated according to a formula using the claimant's earning history.  There are no such "coverage" requirements for SSI benefits, but the potential amount of SSI benefits is uniform and set by statute, dependent upon the claimant's financial situation, and reduced by the claimant's earnings, if any.  There are corresponding and usually identical regulations for each type of benefit.  See, e.g., 20 C.F.R. §§ 404.1520 and 416.920 (evaluation of disability using the five-step procedure under Title II and Title XVI).  Mr. S. filed his application for Title II benefits only.  His coverage status for SSD benefits expires on December 31, 2027.  T14.  In other words, to be entitled to Title II benefits, Mr. S. must prove he was disabled on or before that date.

Commissioner's final decision denying his disability benefits and award benefits outright or, alternatively, remand the matter to the Social Security Administration for further proceedings.  See Docket Nos. 9 & 14.  The Commissioner has filed a brief seeking affirmance of the agency's decision below.  See Docket No. 13.

This appeal of the Commissioner's final decision denying benefits is properly before the court pursuant to 42 U.S.C. § 405(g).  The parties have consented to this magistrate judge handling this matter pursuant to 28 U.S.C. § 636(c).  Docket No. 5.

## FACTS

Mr. S. filed for disability benefits alleging he became disabled November 18, 2022.  Administrative Record (AR) 66.  His application was denied initially (AR 90) and on reconsideration (AR 103).  Mr. S. then requested a hearing before an Administrative Law Judge (ALJ).  AR 110.

### A.    Medical Records

Mr. S. has set forth a comprehensive description of his medical records in the agency record.  See Docket No. 9 at 6-12.  The court incorporates that description herein by reference.  A detailed description of relevant medical records is contained in the DISCUSSION section of this opinion.

**B.    Lay Function Reports**

    **1.    Mr. S.'s Reports**

Initially, Mr. S. listed the following conditions as disabling: depressive disorder, anxiety, chronic sleep impairment, depressed mood, difficulty in adapting to work-life setting, difficulty in adapting to stressful circumstance, impaired impulse control, impairment of short and long term memory, disturbances of motivation and mood, and occupation and social impairment with reduced reliability. AR 256. This list of impairments was later expanded to include physical impairments. AR 274. In his first function report Mr. S. listed 10 separate medications his doctors had prescribed for sleep, high blood pressure, high cholesterol, depression, hyperthyroidism, iron deficiency, and loose stools—but no prescribed medications for pain. AR 258-59.

About six weeks later, Mr. S. submitted a second function report. AR 274-81. In that document Mr. S. stated his chronic sleep impairment makes it impossible to focus on work tasks. AR 274. He also stated his multiple physical impairments render him unable to sit or stand for extended periods of time. Id. He stated the space provided on the form was insufficient to describe how all his impairments impact his ability to work. AR 274. Mr. S. stated that he woke up several times a night due to severe sleep apnea. AR 275.

Mr. S. wrote that he feeds his dogs and walks them rarely. Id. He takes 2 to 3 baths per night to try to alleviate his bodily soreness. Id. He sometimes rewears dirty clothes if he does not have the energy and sometimes forgets to eat. Id.

Mr. S. said he needs special reminders to remember to take care of personal needs and grooming. AR 276. He sets alarms, sends himself texts and has someone else who reminds him to take his medications. Id. Mr. S. reported he cooks simple things like sandwiches and soup, but can no longer grill. Id.

Mr. S. said he vacuums, does laundry and mows, but it takes him a long time. Id. He needs reminders or encouragement to get these tasks done. Id. It is sometimes very hard to mow or remove snow, so Mr. S. hires someone to do these things. Id.

Mr. S. stated that he could walk, drive a car, and ride in a car, but that his hips flare up a lot. AR 277. The maximum car trip he could take was 3 hours and that would require that he be allowed to stop and get out a lot. Id. He stated he was able to shop for food and dog food, pay bills, count change, and handle his own savings and checking accounts. Id. He described his hobbies as playing Pokémon Go, fantasy sports, and collecting cards. AR 278. He stated he does not go anywhere on a regular basis. Id. He also stated he has trouble getting along with family, friends, neighbors, or others, stating his neighbor didn't like him. Id.

Mr. S. further stated he could walk half a mile and then would have to rest 20 minutes. AR 279. He stated he has hearing loss and struggles with spoken instructions. Id. He also stated others would say he did not follow written instructions well. Id.

When asked to check the boxes of all the functions affected by his impairments, Mr. S. checked every box except for seeing, stair climbing, and talking.  Id.  Otherwise, he indicated he is impaired in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, memory, completing tasks, concentration, understanding, following instructions, using hands and getting along with others.  Id.

Mr. S. wrote that he sometimes cannot handle stress and he severely dislikes change.  AR 280.  He is very bothered when people come up behind him.  Id.  He wrote that his "feet are completely collapsed" and that he uses "very severe inserts" that were prescribed by a doctor.  Id.

Mr. S. again listed many medications he is prescribed.  AR 281.  He listed the side effects of these medications to include tiredness, headaches, stomach issues, nausea, constipation, mood changes, fatigue, heat intolerance, weakness, weight gain, sleep issues, extreme grogginess, and light-headedness. Id.

Six months after the second function report, Mr. S.'s lawyer filed an updated function report.  AR 286-93.  He stated that Mr. S.'s sleeping, depression, and anxiety had gotten worse.  AR 287.  He stated that he could not sit or stand for long periods of time because of his back impairment.  Id. He also stated he just did not fit into the civilian work force culture and struggled with it quite a bit.  Id.

Thirteen different prescription medications were now listed together with why the drug was prescribed and what its side effects were.  AR 290.  Three of

the medications were for pain or muscle spasm (cyclobenzaprine[2], diclofenac topical gel, and gabapentin[3]).  Id.  Two were prescribed for mental health and sleep (sertraline & trazodone).  Id.  The side effects for just these 5 medications were Ms. S feeling like a zombie, not feeling like the same person if he did not take his medication, being tired/drowsy, and being groggy/drowsy/not able to operate a motor vehicle.  Id.

Mr. S. stated his activities had changed for the worse since his last function report.  AR 291.  He had become less social and found it uncomfortable to be in a room with 15-20 other people.  Id.  His physical spasms "drop me to the ground" and last for 10-30 minutes.  Id.  Mr. S. stated that when these spasms hit, there was nothing he could do but wait for them to pass.  Id.

He stated his memory had deteriorated and he had to text himself and set reminders.  AR 292.  The constant ringing in his ears that he experienced caused Mr. S. to have difficulty concentrating.  Id.  He explained he does not like people coming up behind him, strangers touching him, or being startled.  Id.  Sometimes he gets so annoyed with people talking about certain subjects that he wants to just get up and leave.  Id.

Mr. S. filed a fourth function report about a month later.  AR 296-308.  On the check-the-box part of the form Mr. S. now indicated his ability to climb

---

[2] Cyclobenzaprine is a muscle relaxant prescribed for muscle spasm.

[3] Mr. S.'s medical records indicate he was prescribed gabapentin for restless leg syndrome, not for pain.  See, e.g., AR 827.

stairs was also impacted by his impairments. AR 301. He changed the distance he could walk to "a couple blocks." Id. Otherwise, the report was much the same as Mr. S.'s previous reports.

A fifth function report was filed by Mr. S.'s attorney five months later. AR 317-24. The report detailed a worsening thyroid conditions and a recent episode of PTSD. AR 318. Mr. S. said his muscle spasms continued to "drop me to the ground" and that he had tried acupuncture and massage with no relief. Id. The report was otherwise much the same as Mr. S.'s fourth report.

### 2.    Girlfriend's Report

Mr. S's girlfriend, Ms. J., also submitted a function report. AR 262-69. She stated she has known Mr. S. for 12 years. AR 262. She also stated she and Mr. S. spend 50 percent of their time together and 50 percent apart. Id. Mr. S. lives in a house. Id.

Ms. J. described Mr. S.'s chronic sleeping disorder as impacting his daytime functions and that his medications also had numerous negative side effects. Id. She stated Mr. S.'s memory loss impacts his ability and focus for everyday things. Id.

Ms. J. described a typical day in Mr. S.'s life as waking up, taking care of his dogs, and maybe lying back down. AR 263. Taking care of his dogs consists in feeding them and giving them water and then letting the dogs out into the backyard. Id. At times, Ms. J. or Mr. S.'s sister help with the dogs. Id. He may lie back down after attending to the dogs. Id. He fixates on sports or a game most of the day, often forgetting to eat. Id.

7

Ms. J. wrote that Mr. S. tosses and turns much of the night and will take multiple baths in the night to try to find enough comfort/relief to sleep.  Id.  Mr. S. must be reminded to put on clean clothes, deodorant, and to get a haircut.  Id.

Ms. J. wrote that Mr. S. requires special reminders to take care of personal needs, grooming, and taking medications and she provides these through verbal statements and lists.  AR 264.  Ms. J. does most of the cooking or ensures that Mr. S. has eaten.  Id.  He will sometimes eat premade sandwiches or frozen meals.  Id.  Ms. J. wrote that before Mr. S. had all these impairments, he would do most of the cooking.  Id.  Memory loss and general malaise were the reasons Ms. J. said that Mr. S. no longer cooks.  Id.

Ms. J. said that Mr. S. mowed on occasion when someone wasn't hired to mow and did limited cleaning with guidance.  Id.  Mr. S. needed verbal direction and constant reminders to accomplish these tasks.  Id.  Soreness, memory loss, and pain due to past military injuries were the reasons Ms. J. gave for why Mr. S. no longer did his own house and yard work.  AR 265.

Ms. J. said Mr. S. was able to go outside alone, walk, drive a car, and ride in a car.  Id.  She noted no limitations in these activities.  Id.  Ms. J. said that Mr. S. could do his own shopping, but was usually accompanied by someone else and had a specific list.  Id.  She stated Mr. S. could pay bills, count change, and handle his own checking and savings accounts.  Id.  She noted he often forgot he had purchased an item and then ended up repurchasing that item.  AR 266.  Ms. J. described Mr. S.'s hobbies as

collecting sports cards, playing fantasy sports, and Pokémon.  Id.  There were
no destinations Mr. S. went to on a regular basis.  Id.  She described Mr. S.'s
family relationships as "strained."  AR 267.

Regarding the check boxes for functions affected by Mr. S.'s disabilities,
Ms. J. checked all the same boxes as Mr. S. and left unchecked all the same
boxes he did except that Mr. S. said his disabilities affected his ability to get
along with others, and Ms. J. did not check that box.  Compare AR 267, with
AR 279.

Ms. J. said Mr. S. could walk a mile or less before having to rest and that
he could not pay attention for very long.  AR 267.  Ms. J. said that sometimes
Mr. S. would eat in the night and not remember doing so.  AR 268.  She wrote
that she believed Mr. S. needed hearing aids.  Id.

Ms. J. said that Mr. S. took 8-10 prescription medications which caused
side effects, but she did not have the names of the drugs or what side effects
were caused by which drugs.  AR 269.

Ms. J. filed a second function report several months later.  AR 309-16.
She now reported that Mr. S. spent most days in bed.  AR 310.  She indicated
Mr. S.'s back spasms had gotten so bad he could not sleep or walk at times.
AR 309.  His sleep and memory impairments had made it difficult for him to
learn new skills and follow basic tasks.  Id.

Prior to the hearing before the ALJ, Ms. J. filed a statement to be
considered.  AR 359-60.  She repeated many of the observations recorded in
her earlier function reports.  She stated that Mr. S. prioritizes sports over basic

needs and his relationships and was/is unable to handle life problems such as flooding in a basement, misunderstanding a quote received from a restoration company.  AR 359.  She stated that Mr. S. has a limited ability to acknowledge how slow he is performing tasks and how many reminders and redirections he needs to complete tasks.  Id.

### 3. Sister's Report

Mr. S.'s sister, Ms. S., also filed a statement in advance of the ALJ hearing.  AR 357-58.  She stated she assists her brother with remembering to do household tasks and helps take care of his dogs.  AR 357.  She stated sometimes Mr. S. is unable to get out of bed due to his prescribed medications. Id.

## C. Hearing Before the ALJ

A hearing was held before the ALJ with Mr. S. and vocational expert (VE) Robin Cook testifying.  AR 36-64.  Mr. S. was represented by the same counsel at the ALJ hearing as in this appeal.  AR 38.  Rather than recount the entirety of the evidence adduced at the hearing, the court discusses pertinent portions of the evidence in connection with each issue in the DISCUSSION section of this opinion.  Mr. S.'s testimony at the hearing was largely a repetition of his function reports previously submitted.

**D.**    **ALJ's Decision**

The ALJ denied benefits.  AR 14-30.  The ALJ found that Mr. S. had no
substantial gainful activity after the date of alleged disability.  AR 19.

The ALJ found at step two that Mr. S. had severe impairments of
degenerative disc disease, major depressive disorder, generalized anxiety
disorder, an unspecified neurocognitive disorder, and post-traumatic stress
disorder.  Id.  The ALJ acknowledged that Mr. S. had been diagnosed with sleep
apnea, restless leg syndrome, hypothyroidism, and obesity, but concluded
these impairments were not severe because they did not—individually or in
combination—reduce Mr. S's ability to work.  AR 20.

The ALJ also acknowledged the results of Mr. S.'s audiologic testing and
verified hearing loss, but held that this condition also did not impact Mr. S.'s
ability to work.  Id.  Mr. S. in this appeal takes no issue with the ALJ's findings
at step two of the disability analysis.  See Docket No. 9 & 14.

At step three, the ALJ found that Mr. S did not have any impairment or
combination of impairments that met or equaled the severity of any listed
impairment in 20 CFR Part 404, Subpart P, Appendix 1 ("the listings").  AR 20.
In discussing the paragraph B criteria for Mr. S.'s mental impairments, the ALJ
found he had a moderate limitation in: (1) his ability to understand, remember
and apply information; (2) his ability to concentrate, persist or maintain pace;
and (3) in adapting or managing himself.  AR 21.  The ALJ did not find a
greater than moderate limitation because Mr. S.'s treating medical providers
had documented him to have normal memory at times and Mr. S. was able to

11

manage his own personal finances, something the ALJ said required substantial capacity to understand, remember, and apply information. Id. The ALJ noted only one documented instance in which Mr. S. had difficulty regulating his behavior. AR 20-21.

At step four, the ALJ formulated the following RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently. He can stand and/or walk about 6 hours in an 8-hour workday and can sit about 6 hours. He can occasionally climb ramps, stairs, ladders, ropes, and scaffolds. He can occasionally balance, stoop, kneel, crouch, and crawl. Overhead reaching, bilaterally, is limited to frequently. He can understand, remember, and carryout (sic) simple instructions with only occasionally changes in the work setting. He can have occasional interactions with supervisors and coworkers but should have no interactions with the public.

AR 22.

The ALJ concluded that with the above RFC, Mr. S. could not return to any past relevant work, but that there were jobs existing in significant numbers in the national economy that Mr. S. would be capable of performing. AR 28. Specifically, the ALJ found Mr. S. could do the jobs of office helper (DOT#239.567-010), photocopy machine operator (DOT# 207.685-014), and housekeeper cleaner (DOT# 323.687-014). AR 29. Because Mr. S. could perform these jobs, the ALJ concluded he was not disabled. AR 30.

## E.    Other Evidence—Veterans Affairs Disability Rating

The United States Department of Veterans Affairs (VA) awarded Mr. S. permanent and total disability status as of January 12, 2023, for service-

connected disability.[4]  AR 185-191, 193.  The disability was depressive disorder related to the service-connected disability of trochanteris pain syndrome with limitation of extension, left hip.  AR 194.  The VA rated Mr. S. as 70 percent disabled based on:  anxiety, chronic sleep impairment, depressed mood, difficulty in adapting to a work-like setting, difficulty in adapting to stressful circumstances, difficulty in adapting to work, difficulty in establishing and maintaining effective work and social relationships, disturbances of motivation and mood, impaired impulse control, impairment of short- and long-term memory, mild memory loss, and occupational and social impairment with reduced reliability and productivity.  AR 194.

## DISCUSSION

### A.    Standard of Review

When reviewing a denial of benefits, the court will uphold the Commissioner's final decision if it is supported by "substantial evidence [i]n the record as a whole."  42 U.S.C. § 405(g); Minor v. Astrue, 574 F.3d 625, 627 (8th Cir. 2009) (citing Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997)).  "[S]ubstantial evidence [is] defined as 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support [the Commissioner's] conclusion.' "  Klug v. Weinberger, 514 F.2d 423, 425 (8th Cir. 1975) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

---

[4] The VA finding of disability was made approximately 10 months before the hearing was held before the ALJ.  Compare AR 38 (hearing held 10/21/24), with AR 185 (VA determination made 3/29/23 finding disability as of 1/12/23).

"This review is more than a search of the record for evidence supporting the [Commissioner's] findings, and requires a scrutinizing analysis, not merely a rubber stamp of the [Commissioner's] action." Scott ex rel. Scott v. Astrue, 529 F.3d 818, 821 (8th Cir. 2008) (internal quotations and citations omitted).  Yet, "[i]n conducting [its] limited and deferential review of the final agency determination under the substantial-evidence standard, [the court] must view the record in the light most favorable to that determination." Chismarich v. Berryhill, 888 F.3d 978, 980 (8th Cir. 2018).

In assessing the substantiality of the evidence, the evidence that detracts from the Commissioner's decision must be considered, along with the evidence supporting it.  Minor, 574 F.3d at 627.  The Commissioner's decision may not be reversed "merely because substantial evidence would have supported an opposite decision." Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992)); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  "[I]f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Commissioner's] findings," the Commissioner must be affirmed.  Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993) (quoting Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)).  "In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record." Mittlestedt v. Apfel, 204 F.3d 847, 851 (8th Cir. 2000) (citations omitted).

The court must also review the decision by the ALJ to determine if an error of law has been committed. Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992); 42 U.S.C. § 405(g). Specifically, a court must evaluate whether the ALJ applied an erroneous legal standard in the disability analysis. Erroneous interpretations of law will be reversed. Walker v. Apfel, 141 F.3d 852, 853 (8th Cir. 1998) (citations omitted). The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court. Smith, 982 F.2d at 311 (finding "appropriate deference" should be given to the SSA's interpretation of the Social Security Act).

## B.    The Disability Determination and the Five-Step Procedure

Social Security law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416(I), 423(d)(1)(A); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

The ALJ applies a five-step procedure to decide whether an applicant is disabled. This sequential analysis is mandatory for all SSI and SSD/DIB applications. Smith v. Shalala, 987 F.2d 1371, 1373 (8th Cir. 1993); 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One**: Determine whether the applicant is presently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). If the

applicant is engaged in substantial gainful activity, she is not disabled and the inquiry ends at this step.

**Step Two**: Determine whether the applicant has an impairment or combination of impairments that are *severe*, i.e., whether any of the applicant's impairments or combination of impairments significantly limit her physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). If there is no such impairment or combination of impairments, the applicant is not disabled and the inquiry ends at this step. NOTE: the regulations prescribe a special procedure for analyzing mental impairments to determine whether they are severe. Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992); 20 C.F.R. § 404.1520a. This special procedure includes completion of a Psychiatric Review Technique Form (PRTF).

**Step Three**: Determine whether any of the severe impairments identified in Step Two meets or equals a "Listing" in Appendix 1, Subpart P, Part 404. 20 C.F.R. § 404.1520(d). If an impairment meets or equals a Listing, the applicant will be considered disabled without further inquiry. Bartlett v. Heckler, 777 F.2d 1318, 1320 n.2 (8th Cir. 1985). This is because the regulations recognize the "Listed" impairments are so severe that they prevent a person from pursuing any gainful work. Heckler v. Campbell, 461 U.S. 458, 460 (1983). If the applicant's impairment(s) are *severe* but do not meet or equal a *Listed impairment*, the ALJ must proceed to step four. NOTE: The "special procedure" for mental impairments also applies to determine whether a severe mental impairment meets or equals a Listing. 20 C.F.R. § 1520a(c)(2).

**Step Four**: Determine whether the applicant is capable of performing past relevant work (PRW). To make this determination, the ALJ considers the limiting effects of all the applicant's impairments, (even those that are not *severe*) to determine the applicant's residual functional capacity (RFC). If the applicant's RFC allows him to meet the physical and mental demands of his past work, he is not disabled. 20 C.F.R. §§ 404.1520(e)-(f); 404.1545(e). If the applicant's RFC does not allow him to meet the physical and mental demands of his past work, the ALJ must proceed to Step Five. 20 C.F.R. §§ 404.1520(f).

**Step Five**: Determine whether any substantial gainful activity exists in the national economy which the applicant can perform. To make this determination, the ALJ considers the applicant's RFC, along with his age, education, and past work experience.

20 C.F.R. § 404.1520(g).

## C. Burden of Proof

The plaintiff bears the burden of proof at steps one through four of the five-step inquiry.  Barrett v. Shalala, 38 F.3d 1019, 1024 (8th Cir. 1994); Mittlestedt, 204 F.3d at 852; 20 C.F.R. § 404.1512(a).  The burden of proof shifts to the Commissioner at step five.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Clark v. Shalala, 28 F.3d 828, 830 (8th Cir. 1994).  "This shifting of the burden of proof to the Commissioner is neither statutory nor regulatory, but instead, originates from judicial practices."  Brown v. Apfel, 192 F.3d 492, 498 (5th Cir. 1999).  The burden shifting is "a long-standing judicial gloss on the Social Security Act."  Walker v. Bowen, 834 F.2d 635, 640 n.3 (7th Cir. 1987).  Moreover, "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

## D. Assignments of Error

Mr. S's assignments of error all center on the RFC formulated by the ALJ.  First, he asserts the physical RFC should have and did not include limitations for sit/stand, standing/walking and alternating sit/stand.  Docket No. 9 at 22-24.  Second, he asserts the RFC should have included noise restrictions based on Mr. S's demonstrated hearing disability.  Id. at 25.  Third, he argues the RFC failed to take into account his mental limitations.  Id. at 25-

28.  Fourth, he argues the ALJ mischaracterized or put undue emphasis on his activities of daily living.  Id. at 28-30.

### 1.     RFC Formulation—The Standard

Residual functional capacity is "defined as what the claimant can still do despite his or her physical or mental limitations."  Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001) (citations omitted, punctuation altered).  "The RFC assessment is an indication of what the claimant can do on a 'regular and continuing basis' given the claimant's disability.  20 C.F.R. § 404.1545(b)."  Cooks v. Colvin, No. CIV. 12-4177-KES, 2013 WL 5728547, at *6 (D.S.D. Oct. 22, 2013).  The formulation of the RFC has been described as "probably the most important issue" in a Social Security case.  McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982), abrogation on other grounds recognized in Higgins v. Apfel, 222 F.3d 504 (8th Cir. 2000).

When determining the RFC, the ALJ must consider all of a claimant's mental and physical impairments in combination, including those impairments that are severe and those that are nonsevere.  Lauer, 245 F.3d at 703; Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (July 2, 1996).  Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on *all* the relevant evidence . . . a claimant's residual functional capacity is a medical question."[5]  Lauer, 245 F.3d at 703 (citations

---

[5] Relevant evidence includes:  medical history; medical signs and laboratory findings; the effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication); reports of daily activities; lay

omitted) (emphasis added).  Therefore, "[s]ome medical evidence must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." <u>Id.</u> (citations omitted).

"The RFC assessment must always consider and address medical source opinions."  SSR 96-8p.  If the ALJ's assessment of RFC conflicts with the opinion of a medical source, the ALJ "must explain why the [medical source] opinion was not adopted." <u>Id.</u>  Medical opinions are evaluated based on whether they are supported and consistent with other evidence in the record. 20 C.F.R. § 404.1520c.  Other factors considered in determining what weight to give a medical opinion are whether the medical provider had a relationship with the claimant and whether the provider has a specialization that makes them more qualified to render an opinion within a particular area. <u>Id.</u>

RFC is an ultimate issue reserved to the ALJ.  20 C.F.R. § 404.1527(d). Medical source opinions on these ultimate issues must still be considered by the ALJ in making these determinations. <u>Id.</u>  However, the ALJ is not required to give such opinions special significance because they were rendered by a treating medical source. <u>Id.</u>

"When there is no allegation of a physical or mental limitation or restriction of a specific functional capacity, and no information in the case

---

evidence; recorded observations; medical source statements; effects of symptoms, including pain, that are reasonably attributable to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations.  <u>See</u> SSR 96-8p.

record that there is such a limitation or restriction, the adjudicator must consider the individual to have no limitation or restriction with respect to that functional capacity." SSR 96-8p. However, the ALJ "must make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." Id.

When writing its opinion, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence . . . . In assessing RFC, the adjudicator must . . . . explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." Id.

Finally, to find that a claimant has the RFC "to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Reed v. Barnhart, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted); SSR 96-8p ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule").

### 2.    Physical RFC—Sit/Stand, Stand/Walk, Alternating

In arguing that the ALJ should have included greater limitations for sitting, standing, and walking in Mr. S.'s RFC, Mr. S. emphasizes the physical findings for his back and hip. See Docket No. 9 at 23 (citing AR 550-51, 588). He also highlights the functional limitations opined on by Nurse Practitioner

Salameh and noted by the VA.  Id. (citing AR 523-24, 587).  Mr. S. also points

to the fact that he receives frequent chiropractic treatment for his back and

hip.  Id. (citing AR 971).  Mr. S. also points to his own testimony as to the

limits of his ability to function.  Id. (citing AR 43, 45 & 46).

These records cited by Mr. S. show that he has mild disc degeneration in

his upper thoracic spine without significant spinal canal or foraminal stenosis.

AR 550.  His thoracic spinal cord is normal.  Id.  His lumbar vertebral bodies

are normal with no focal marrow abnormality or evidence of acute fracture.  Id.

Lumbar vertebral body statute and alignment are normal.  Id.  There is mild

disc degeneration at L5-S1 with mild left foraminal stenosis but no definite

nerve root impingement.  AR 551.

Mr. S.'s left hip has mild degenerative changes, with no fracture, no

dislocation, no joint effusion, and soft tissues are unremarkable.  AR 588.

Nurse Practitioner Salameh performed a consultative examination of

Mr. S. September 9, 2023.  AR 582.  Examining Mr. S.'s spine, she found no

muscle spasm or malalignment.  AR 584.  She found his neuromuscular

strength to be normal.  Id.  She found his reflexes to be normal. Id.

Salameh observed Mr. S. get on and off the examination table, perform

tandem walking, and walking on his heels and his toes, all of which were

performed without difficulty.  Id.  He was able to partially squat and rise from

that position and he had a normal, reciprocal gait.  AR 585.

Salameh recommended sitting, standing, and walking be limited to

"frequently" due to decreased range of motion in Mr. S.'s cervical and lumbar

spine.  AR 587.  "Frequently" is defined by the Commissioner as occurring from one-third to two-thirds of the time.  <u>Overy v. Berryhill</u>, Case No. 4:18-CV-264-ACL, 2019 WL 1379965 at *5 (E.D. Mo. Mar. 27, 2019) (citing SSR 83-10).  In other words, in an eight-hour workday, Salameh was saying Mr. S. could sit for up to 5.32 hours, walk for up to 5.32 hours, and stand for up to 5.32 hours.  The ALJ opined he could walk, sit, and stand for 6 hours a day.  AR 22.  So the difference between what Salameh recommended (which Mr. S. urges this court to adopt), and what the ALJ actually found, is a difference in each of these activities of less than 30 minutes.

The ALJ cited several records in support of his RFC formulation.  On April 5, 2022, Mr. S. was seen by a chiropractor.  AR 472.  He complained of an exacerbation of chronic mid back pain with spasms and left hip pain.  <u>Id.</u>  He was adjusted and recommended to return for another visit in one to two weeks.  <u>Id.</u>  Mr. S. returned two weeks later on April 19, 2022, stating he had recovered from the flareup of upper back pain that he reported last time and that his left hip was feeling better.  AR 470.  He rated his midback pain 3/10 and his lower back pain 1/10.  <u>Id.</u>

On May 26, 2022, Mr. S. came to the chiropractor reporting pain of 3/10 in his mid to upper back and lower back to left hip.  AR 448.  Mr. S. told his care provider he continues "to find some relief with treatment here so [he] is appreciative to have access to return for further care."  <u>Id.</u>  Mr. S. was adjusted and said he would return if he had a future setback.  <u>Id.</u>  Mr. S.'s next chiropractic visit was July 11, 2022, over a month later, when he again

reported 3/10 pain in his upper and lower back.  AR 432.  He reported that his last treatment was helpful and the pain in his neck had gone away.  Id.

On May 31, 2023, Mr. S. came to the chiropractor with 7/10 pain in his lumbar and thoracic spine after driving to the zoo in Omaha [Nebraska] and walking all over the zoo for several hours.  AR 371.  Mr. S. was adjusted and felt better afterward.  AR 371-72.  The care provider instructed Mr. S. to return in one month, but to come back sooner if he did not experience steady recovery.  AR 372.  The next chiropractic visit was six weeks later on July 10, 2023.  AR 366-67.  Mr. S. reported his back was "much better" after his last visit.  AR 366.  The next chiropractic adjustment was recommended to be in 1 to 2 months for pain management.  AR 367.

The ALJ also cited to the same spinal MRI of Mr. S. conducted on August 7, 2023, as Mr. S. emphasizes, the record is simply duplicated in the AR. Compare AR 571 (cited by the ALJ), with AR 550 (cited by Mr. S.).  The ALJ also cited to Nurse Practitioner Salameh's consultative examination.

The ALJ cited to chart notes from Mr. S.'s acupuncture and massage therapists.  On June 8, 2022, Mr. S. underwent acupuncture.  AR 612-13.  He returned for a repeat acupuncture treatment on June 22, 2022, stating that he "did get good relief after his last acupuncture treatment."  AR 609-10.  He received another acupuncture treatment.  Id.

On June 26, 2023, Mr. S. received the first of 12 one-hour massage therapy treatments.  AR 604.  On July 12, August 17, and September 12, 2022, Mr. S. received massage therapy again.  AR 600-03, 608-09.  He reported

that he had been getting relief from the acupuncture treatment. AR 608. He also stated the massage therapy was giving him "relief that lasted a while since the last visit." AR 602. At a massage therapy visit dated October 20, 2023, Mr. S. continued to state that the massage therapy was giving him relief that "lasted a while" and resulted in less pain, less stiffness, and greater range of motion. AR 598. He rated his back pain 3/10 on this date and stated his activities of daily living and functioning had improved. Id.

Mr. S. continued to receive massage therapy on November 3 & 30, December 27 & 28, 2023, and January 11, February 8 & 29, April 1, 22 & 29, 2024. AR 951-70. In each of these records he and his provider recorded improvement in Mr. S.'s condition, both subjectively and objectively. Id. In one of his final visits he rated his back pain as 2/10. AR 951.

Finally, the ALJ also relied on physical residual functional capacity opinions by Mark Comnick, D.O. (issued Nov. 2, 2023), and by Dr. Kevin Whittle (issued Feb. 15, 2024). AR 66-72, 78-85. Dr. Comnick opined that Mr. S. was capable of standing, walking, and sitting for 6 hours in an 8-hour workday. AR 71. Dr. Comnick opined that Mr. S.'s description of his functional capacity enjoyed some support in the medical records, but not to the degree stated by Mr. S. AR 72.

Dr. Whittle also opined that Mr. S. could stand, walk, and sit for 6 hours. AR 84. Dr. Whittle also agreed that Mr. S.'s statements were partially consistent with the record medical evidence, but not to the degree he reported. AR 85.

24

The court concludes that the ALJ's physical RFC concerning Mr. S.'s ability to stand, sit and walk is supported by the evidence in the record as a whole. The three medical opinions on this issue—Dr. Whittle, Dr. Comnick, and Nurse Practitioner Salameh—all basically opined the same thing. They all opined that Mr. S. could walk, sit and stand between 5.32 hours and 6 hours per day. Drs. Whittle and Comnick based their opinions on a review of the record evidence, while Nurse Practitioner Salameh based her opinion on an actual examination of Mr. S.

Mr. S. does not provide the court with any competing medical opinion limiting him to less hours of sitting, standing, and walking than these three medical opinions cited by the ALJ. The ALJ's physical RFC is congruent with these opinions. He concluded Mr. S. could walk, sit, and stand for 6 hours in a workday. AR 22.

Mr. S. emphasizes the MRI which found mild degenerative changes in his spine and left hip. But a diagnosis does not equal an impairment in a claimant's ability to function. Gann v. Colvin, 92 F. Supp. 3d 857, 884 (N.D. Iowa 2015). Just because a physical medical finding was found to exist at an earlier step in the five-step sequential analysis does not mean there automatically must be a corresponding functional limitation in the RFC formulated at step four. Id. at 884-85. Instead, the impairments found at earlier steps should be considered when formulating RFC, but they do not "automatically translate into limitations on the claimant's ability to work." Id. at 885.

Here, the ALJ properly credited the medical evidence concerning Mr. S.'s spine and hip, but found that those did not translate into greater functional limitations than those set forth in the RFC.  AR 24-25.  The ALJ noted that the objective medical testing done on Mr. S. showed normal strength, sensation, and reflexes in his spine and hip.  AR 25.  The ALJ also noted that the physical findings shown in the MRI were very minor.  AR 25.  Furthermore, Mr. S.'s medical care providers treated his back pain conservatively with pain medication, topical analgesic gel, chiropractic manipulation, massage, acupuncture, physical therapy, ice, heat, and thoracic facet injections.  AR 25.  There have been no surgical interventions, implanted stimulation devices, or any other intrusive treatment.

The VA provided lists of all the medications Mr. S. was prescribed at different times.  AR 713-20.  The pain reliever hydrocodone appears on this list three times during the period from November 2022 (date of alleged onset of disability) and the hearing date.  AR 713, 714, & 715 (for a total of 32 tablets).  But Mr. S. testified that he did not like taking hydrocodone.  AR 49.  None of Mr. S.'s other medications were being taken for pain.  He was prescribed gabapentin, which can be used to treat nerve pain, but is also used to treat restless leg syndrome, which Mr. S. suffers from.  His medical records indicate the gabapentin was prescribed for restless leg syndrome, not pain.  See, e.g. AR 827.  Despite counsel's argument to the contrary herein, the records reflect (as discussed above) that these forms of conservative treatment brought significant pain relief to Mr. S.

The primary thrust of Mr. S.'s argument on this issue is that lay testimony given by himself, his girlfriend, and his sister concerning his ability to stand, sit and walk is at odds with the RFC formulated.  But as stated above, the issue of RFC is a medical question at bottom.  <u>Lauer</u>, 245 F.3d at 703.  The ALJ was required to rely on some medical evidence in formulating the RFC.  <u>Id.</u>  Here, the only medical evidence in the record concerning Mr. S.'s physical RFC supports the ALJ's findings and the only evidence in the record that contradicts the ALJ's findings is lay testimony.

The ALJ partially credited this lay testimony, but found that the degree of limitation described by Mr. S., his girlfriend, and his sister was not consistent with the record evidence.  AR 25.  The court notes that Mr. S.'s description of his ability to function changed over time.  Initially he stated he could vacuum, do laundry, mow, and shovel snow, though these tasks sometimes took him a long time.  AR 276.  Then he stated he would mow only when it was not being done by hired help.  AR 264.  Then he testified at the hearing that he never mows.  AR 48.  He initially described being able to walk a half a mile at a time before needing to rest (AR 276), then testified at the ALJ hearing he could only walk a "few blocks" on his best day (AR 45).

Mr. S. insist in this record that he can only walk his dogs a couple of blocks at a time.  Docket No. 9 at 29.  But he stated to his medical care provider a short time before the ALJ hearing that he takes his dogs on walks and that he stays active with his dogs.  AR 852.

Ms. J., Mr. S.'s girlfriend, initially reported that Mr. S. could mow on occasion and that he had no limitations in his ability to walk.  AR 264-65.  She stated he could walk a mile or less before needing to rest.  AR 267.  In a later report, Ms. J. wrote that when Mr. S. had spasms, he could not walk at times.  AR 309.  The court notes there are very few instances in the medical record where Mr. S. reported the occurrence of muscle spasms.  Mr. S. and Ms. J.'s lay descriptions of Mr. S.'s ability to walk, sit, and stand changed over time, but at least some of their descriptions are consistent with the physical RFC as found by the ALJ.

The court affirms the ALJ's physical RFC as formulated at step four.  This decision was supported by substantial evidence in the record and the ALJ properly set forth the applicable law and applied it correctly.[6]

### 3.    Physical RFC—Noise/Hearing Restrictions

Mr. S. argues the ALJ should have included noise restrictions in his RFC.  The Commissioner argues that the ALJ properly considered Mr. S.'s hearing loss and concluded it would not diminish his capacity to work.  Docket No. 13 at 9.  See AR 20.  In addition, the Commissioner notes that two of the three jobs that the ALJ concluded Mr. S. could perform require *no* ability to hear.  Id.  So even if the RFC included the noise restrictions posited by Mr. S.,

---

[6] To the extent Mr. S.'s flat feet impairment is part of his argument against the standing/walking portions of the physical RFC, the court notes that the podiatry records indicate that Mr. S. received custom orthotic inserts for his shoes and reported later that his foot pain was well managed by using these orthotics.  AR 468-69.  There is no indication that Mr. S.'s foot condition impairs his ability to function in the work setting.  Id.

the end result would have been the same:  the ALJ would have concluded he could perform the jobs of photocopy machine operator and housekeeping cleaner.  Id.

In his reply brief, Mr. S. does not acknowledge the Commissioner's argument above.  He merely reiterates that Mr. S. has verifiable hearing loss and that the ALJ failed to include a restriction in the RFC related to hearing. Docket No. 14 at 4.

The medical records indicate that Mr. S. has "mild to moderate sensorineural hearing loss" in both ears.  AR 594.  He has 96% word recognition for speech in quiet environments.  Id.  The audiologist opined that his hearing loss "may cause extra strain in difficult listening environments." Id.  As noted above, the mere existence of a diagnosis or objective medical finding does not automatically equate to an impairment in work functioning. Gann, 92 F. Supp. 3d at 884.  The ALJ did consider Mr. S.'s hearing impairment at step two, but it was not mentioned at step four nor were any functional limitations incorporated into the physical RFC.  Compare AR 20, with AR 22.

Each job in the Dictionary of Occupational Titles has a nine-digit code associated with it.  The three jobs identified by the ALJ are:  photocopying-machine operator (DOT 207.685-014); office helper (clerical) (DOT 239.567-010); and cleaner, housekeeping (DOT 323.687-014).  The first three digits identify the occupational group to which the job belongs.  The second set of

three digits describe, in this order, ratings of how the job requires a worker to function in relationship to data, people, and things.[7]

The fourth, fifth, and sixth digit (data, people, things) have numbers associated with the level of functioning required as follows:

---

[7] See https://occupationalinfo.org/front_223.html (last checked October 7, 2025).

| DATA | PEOPLE | THINGS |
|------|--------|--------|
|  |  |  |
| 0 synthesizing | 0 mentoring | 0 setting up |
| 1 coordinating | 1 negotiating | 1 precision working |
| 2 analyzing | 2 instructing | 2 operating-controlling |
| 3 compiling | 3 supervising | 3 driving-operating |
| 4 computing | 4 diverting | 4 manipulating |
| 5 copying | 5 persuading | 5 tending |
| 6 comparing | 6 speaking-signaling | 6 feeding-offbearing |
|  | 7 serving | 7 handling |
|  | 8 taking instructions-helping |  |

Id.

Using the above chart, the job of cleaner-housekeeper would require Mr. S. to compare data (6), take instructions or help from people (8), and handle things (7).  Taking instructions or helping would necessarily involve hearing skills unless all instruction and response could be reduced to writing.

The job of office helper (clerical) would require Mr. S. to copy data (5), to speak or signal to people (6), and to handle things (7).  Again, speaking or signaling to a person implies that one would also have to hear to receive their response.

The job of photocopying-machine operator would require Mr. S. to compare data (6), take instructions or help people (8), and tend to things (5).

As with the housekeeper job, the requirement that one take instructions or help implies that hearing skills would be needed.  The audiologist concluded Mr. S. may have to strain to hear in difficult hearing environments.  Standing next to an operating copy machine could certainly present one such environment.

The failure to consider a known impairment in conducting a step-four inquiry is, by itself, grounds for reversal.  Spicer v. Barnhart, 64 Fed. Appx. 173, 178 (10th Cir. 2003).  See also Washington v. Shalala, 37 F.3d 1437, 1439-40 (10th Cir. 1994) ("Failure to apply the correct legal standard . . . is grounds for reversal.  We note at the outset that the ALJ failed to consider the plaintiff's [impairment] in conducting the step-four inquiry.  This failure, alone, would be grounds for reversal.") (quotation omitted).  See also Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992) (same).

Here, the ALJ's discussion of Mr. S.'s hearing loss is only found at step two, where the ALJ determined his impairment to be nonsevere.  However, there is no discussion of this acknowledged but nonsevere impairment at step four.  The formulation of RFC requires consideration of all the claimant's impairments, both severe and nonsevere.  Lauer, 245 F.3d at 703; SSR 96-8p.  This court cannot conclude on the basis of the job descriptions themselves that Mr. S.'s hearing loss would nonetheless allow him to do the three jobs identified by the ALJ.  The ALJ's failure to discuss Mr. S.'s hearing loss at steps four and five requires reversal and remand.

**4.    Mental RFC**

32

Mr. S. argues that the ALJ's mental RFC is not supported by evidence in the record as a whole.  He argues that the ALJ ignored the results of psychological testing, cherry-picked mental status notes from medical appointment records, and ignored the lay testimony on Mr. S.'s mental ability to function.  Docket No. 9 at 25-28.  Mr. S. asserts his poor ability to remember—caused by his mental impairments combined with the effects of medications he must take and poor sleep—render him unable to work.  Id. at 27.

The Commissioner contends the ALJ's mental RFC is supported by evidence as a whole in the record.  Docket No. 13 at 10-11.  The Commissioner argues that the mental RFC limiting Mr. S. to understanding, remembering and carrying out simple instructions with only occasional changes and limiting his interactions with supervisors and coworkers adequately incorporates the mental impairments presented in the record.  Id. at 10.

A major emphasis of the lay testimony provided by Mr. S. and Ms. J. is that Mr. S.'s memory is extremely poor, resulting in his inability to do chores and take care of himself without frequent reminders.  The question is whether this lay testimony is supported by the medical evidence.

### a.    Dr. Galen Van Kley

Galen Van Kley, Ph.D., conducted a psychological examination of Mr. S. on August 3, 2023.  AR 527-33.  The Commissioner asked Dr. Van Kley to evaluate Mr. S. for "depressive disorder, anxiety, chronic sleep impairment, difficulty adapting to work/life setting, difficulty in adapting to stressful

circumstances, impaired impulse control, impairment of short and long-term memory, disturbances of motivation and mood, occupational and social impairment with reduced reliability." AR 527.

Dr. Van Kley described Mr. S. as having served in the United States Air Force for 21 years, during which he served in Afghanistan in 2019. AR 528. He was honorably discharged in 2021. Id. Mr. S. had not received any mental health services during the period of alleged disability, had never been hospitalized for psychiatric reasons, and took prescribed psychotropic medications. Id.

Dr. Van Kley's observations of Mr. S. included the following:

[Mr. S. was] casually dressed and adequately groomed, his speech was of normal rate and tone. . . Although he seemed to be responding to interview questions in a forthright manner, Mr. [S.] became agitated during formal testing, making numerous expressions of frustration, and at one point, slamming his pencil down on the table as he struggled with the initial subtest. Consequently, the Flexible Approach to the WMS-IV[8] was utilized as he was struggling to control anger even on the most basic subtests. Despite these issues, he seemed to be putting forth adequate effort, and the results are likely to provide a good indication of his memory functioning and mental status.

Mr. [S.]'s mood seemed neutral during the clinical interview but became angry with an agitated affect during formal testing. . . . His sleep was described as fitful and disturbed while his appetite has declined with no dramatic changes in weight. . . "I'm always tired and I need a lot of sleep because I'm exhausted all the time."

Difficulty concentrating was conveyed along with psychomotor retardation and feelings of worthlessness. Although a plan and

---

[8] Wechsler Memory Scale, Fourth Edition. The American Psychological Association describes the WMS-IV as test for adults to measure various memory and working memory abilities. See https://psycnet.apa.org/doiLanding?doi=10.1037%2Ft15175-000 (last checked October 8, 2025).

> intent for suicide were denied, he stated that he has wished he was
> dead when severely depressed and that he removed all the firearms
> from his home as a result. . . .
>
> Mr. [S.] stated that VA clinicians believe he has posttraumatic
> stress disorder but that he is not convinced that such is the case.
> Nonetheless, he continues to experience flashbacks and distressing
> drams of events during deployment from which he awakens
> drenched in sweat and in a highly anxious state.  He avoids any
> reminders of gunfire and explosions. . . . Gaps in memory for the
> deployment to Afghanistan were described while Mr. [S.] maintains
> an emotional distance from most people, having considerable
> difficulty with trust.  Violent content on television is also strictly
> avoided along with large crowds that make him feel unsafe.
> Hypervigilance was conveyed, noting that having anyone behind
> him is intolerable . . . Sudden noises also evoke an exaggerated
> startle response, and Mr. [S.] talked about intense irritability in
> response to fairly innocuous events such as those encountered in
> the private sector job.

AR 29-30.  Mr. S. described memory difficulties that had beset him in the last

two years (i.e. in approximately 2021).  AR 530.  He resorted to list-making as a

memory aid.  Id.

Dr. Van Kley wrote that although Mr. S. scored in the average range for

intelligence, he scored in the "very-low range" during his Brief Cognitive Status

Exam, part of the WMS-IV.  Id.  Mr. S. took 28 seconds to recite the months of

the year in reverse order and could recall only two of four objects following a

five-minute delay.  Id.  His performance on the Inhibition subtest was

"inordinately slow."  Id.

Mr. S. scored in the borderline range for Auditory and Visual Memory

Index and for Immediate Memory Index.  AR 532.  His score for Delayed

Memory Index was in the extremely-low range.  Id.  Dr. Van Kley wrote that

Mr. S.'s very low scores meant that he had "difficulty encoding and retaining information in both visual and auditory modalities."  Id.

Dr. Van Kley wrote that these scores mean that Mr. S. "would very likely struggle with memory tasks in everyday life."  Id.  Although Dr. Van Kley could not point to one specific cause of Mr. S.'s poor memory, he noted that individuals who suffer from PTSD commonly experience memory issues.  Id. He also wrote that sleep apnea, side effects from medication, and concentration problems secondary to anxiety and low mood may contribute to cause Mr. S.'s poor memory.  Id.

Dr. Van Kley noted that Mr. S. was reluctant to acknowledge the possibility he was suffering from PTSD, which meant he had yet to utilize treatment specifically focused on this condition.  AR 533.  Dr. Van Kley stated that Mr. S. clearly met the diagnostic criteria for PTSD.  AR 532.  Despite Mr. S.'s poor memory, the doctor noted he was managing his instrumental activities of daily living (IADL), including independently managing his finances. AR 533.

### b.    Dr. Eleni Muntz and Lynn Johnson

Eleni Muntz, Ph. D., rendered an opinion as to Mr. S.'s mental impairments and functioning based on a records review only November 4, 2023.  AR 66-76.  Her review of records included Dr. Van Kley's report.  AR 67. Approximately three and a half months later Lynn Johnson also issued a records-based opinion.  AR 78-86.  As Lynn Johnson's report is nearly identical to Dr. Muntz's report, only the details of Dr. Muntz's report are discussed in this opinion.

Dr. Muntz wrote that Mr. S. suffers from four medically determinable mental impairments:  depressive disorder (12.04), trauma-related disorder (12.15), anxiety disorder (12.06), and neurocognitive disorder (12.02).  AR 68-69.  Dr. Muntz characterized Mr. S.'s depressive disorder and trauma-related diagnoses to be severe.  AR 70.  Despite these severe mental diagnoses, Dr. Muntz opined that Mr. S. was only moderately limited by his symptoms, not markedly limited.  Id.

Dr. Muntz opined that Mr. S. was "not significantly limited" in his ability to remember locations and work-like procedures, understand and remember very short and simple instructions, to sustain an ordinary routine without special supervision, and to make simple work-related decisions.  AR 73.  She opined he was moderately limited in his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in

37

proximity to others without being distracted by them; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id.

Socially, Dr. Muntz opined Mr. S. was moderately limited in his ability to interact with the general public, get along with peers or coworkers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  AR 74.  She opined he was not significantly limited in his ability to ask simple questions or request assistance and to accept instructions and respond appropriately to criticism from supervisors.  Id.  He was moderately limited in his ability to respond appropriately to changes in the work setting.  Id.

Dr. Muntz finished by noting that her opinion of moderate rather than marked mental limitations was based on Mr. S.'s ability to understand and respond appropriately to questions, to remember locations and be able to drive there, to shop and go out alone, to manage his finances, to have a girlfriend, to interact appropriately with individuals in stores, and to interact appropriately with his treatment providers.  AR 70.  Id.  She opined he would do well in a work setting where consumer demands are infrequent, he is not under time pressure, and can perform routine work-related activities that he can learn over the course of 30-60 days.  AR 74.

### c.    The ALJ's Mental RFC

The ALJ determined Mr. S. had the mental RFC to "understand, remember, and carry out simple instructions with only occasional changes in the work setting.  He can have occasional interactions with supervisors and coworkers but should have no interactions with the public."  AR 22.

There is nothing in the ALJ's mental RFC that would allow Mr. S. 30 to 60 days to learn and perform work-related activities as opined by Dr. Muntz.  Compare AR 22, with AR 74.  The ALJ's mental RFC also omits the element of being free from time pressure, as opined by Dr. Muntz.  Compare AR 22, with AR 74.  Dr. Van Kley basically opined that Mr. S.'s memory problems would render it very difficult for him to work.  AR 532.

The entirety of the mental limitations opined on by medical care experts do not find expression in the ALJ's mental RFC.  However, it is not necessary that that RFC be supported by a specific medical opinion.  Hensley v. Colvin, 829 F.3d 926, 932 (8th Cir. 2016) (citing Myers v. Colvin, 721 F.3d 521, 526-27 (8th Cir. 2013)).  It is only necessary that the ALJ's assessment be supported "by some medical evidence."  Id.  Here, the ALJ did not explain why he discounted the opinions of Dr. Van Kley and Dr. Muntz.  He wrote only that their opinions were "persuasive" but "the opinions are phrased using various vague terms."  AR 27.  The ALJ gave no examples of which terms he found to be vague, but stated he was formulating Mr. S.'s mental RFC himself "with different limitations."  Id.

The ALJ wrote that the "objective medical evidence is not consistent with the claimant's allegations regarding the intensity, frequency, or persistence of the limiting effects of his mental impairments." AR 24. The ALJ went on to list Mr. S.'s living conditions that were supposedly inconsistent with his claimed mental functional impairments: he lived in a house with his girlfriend; he bathes, dresses, and grooms himself, though with difficulty; he is able to cook simple foods and drive and shop in stores[9]; he plays video games; he walks his three dogs; he watches television and socializes with people via telephone; he vacuums, does laundry, shovels snow, and mows. AR 25.

But the Eighth Circuit has cautioned that courts should not take the word of a claimant at face value about their ability to function when that person suffers from a mental impairment. Hutsell v. Massanari, 259 F.3d 707, 711-13 (8th Cir. 2001). This is because claimants with mental impairments frequently structure their lives in such a way as to minimize stress and thereby reduce their signs and symptoms. Id.

Here, there is evidence that Mr. S.'s girlfriend and sister provide an artificial buffer/support system that allows him to function better than he would otherwise. They remind him repeatedly of tasks and help walk him through simple procedures like making a meal. They walk his dogs for him when he is unable to do so. They check on him repeatedly and help him solve

_____

[9] Mr. S. also indicated he shops by computer for groceries. AR 299. This fact was not noted by the ALJ.

problems.  This support system allows Mr. S. to function better than he would do in an environment bereft of such support.

Furthermore, there is evidence in the record that Mr. S. is somewhat in denial about his PTSD diagnosis.  He related to Dr. Van Kley that he often wakes up in the night sweaty and in a panic after having nightmares or flashbacks of events that happened during his deployment to Afghanistan.  He and his girlfriend also reported he has an exaggerated startle reflex or hypervigilance.  Yet despite these symptoms, Mr. S. expressed skepticism about whether he was suffering from PTSD.  His reports of his own mental functioning are not, then, totally reliable.

The ALJ seemed to find especially significant, albeit at step three, that Mr. S. "is able to manage his personal finances."  AR 21.  The ALJ wrote that managing one's finances is "an activity that reasonably requires substantial capacity to understand, remember, and apply information."  Id.  Maybe 30 years ago that was true, but it is not necessarily true now.

The advent of the internet and the rise of mobile banking apps means that many people do not really manage their finances at all anymore.  The old ways of keeping a checkbook register and recording debits, credits, and a running balance are foreign to many people in our modern economy.  Rather, one's bank account is frequently electronically "managed":  deposits are automatically placed into the account electronically, rent and utility payments are made automatically by electronic means, and the holder of the account frequently relies on whatever balance the app says he has in the account to

41

determine how much money, if any, he has to spend.  The ALJ when questioning Mr. S. at the hearing did not develop any of these facts to determine whether the fact that Mr. S. "manages" his own finances is really indicative of a higher level of mental functioning or not.

Finally, other than being prescribed mental health medications, Mr. S. has largely not sought the help of mental health professionals for his mental impairments—possibly because he discounts or does not fully understand his mental impairments.  The lion's share of the medical records in this record are, therefore, records where Mr. S. was seeking medical help for his physical health.  These records include brief, boilerplate-type notations about Mr. S.'s mental status at the times of these doctor's appointments.  The ALJ glosses over the notations indicating Mr. S. was not doing well mentally and stresses the notations indicating he was doing well.  The court does not find these records of sufficient weight to countermand the opinions of Dr. Van Kley and Dr. Muntz.  The focal point of these visits were not Mr. S.'s mental health nor— as discussed above—is Mr. S.'s own account of his mental well-being especially reliable.

Even the citations the ALJ made to these medical records do not support the ALJ's mental RFC.  For example, the ALJ cited to a VA psychological consult from September 27, 2024, as evidence that Mr. S. has "objectively presented as generally alert, oriented, adequately groomed, and cooperative, with frequent unremarkable moods and affect, and behavior generally within normal limits."  AR 24 (citing, *inter alia*, Ex. 13F/11 (which is AR 852)).  The

page cited by the ALJ indeed records that Mr. S. was "cooperative and friendly," was oriented, had logical and goal-directed thoughts, and memory and concentration were "appropriate and intact."  AR 852.

The ALJ failed to note that this same record stated Mr. S.'s mood was "agitated and tired" and his affect was congruent with this report.  Id.  When directly asked about suicide, Mr. S. stated he had thoughts of suicide, but no intent, plan or means.  Id.  The medical care provider assessed Mr. S.'s risks as depression, mental health conditions, psychosocial stressors, anxiety, and sleep disturbance.  Id.  This same consult reflected that Mr. S. scored extremely high on subjective evaluations of depression and anxiety.  AR 863-66.

Based on the record before this court and the ALJ's written opinion, the court cannot conclude that the ALJ's mental RFC is supported by substantial evidence in the record.  The ALJ did not adopt the limitations articulated by the mental health experts.  The ALJ did not explain why, in particular, he did not follow these opinions he said were "persuasive," and the evidence from Mr. S., his girlfriend, and his sister do not support the mental RFC asserted by the ALJ.  The court reverses and remands for the ALJ to further explain his mental RFC at step four.

### 5.    RFC—Evaluation of Activities of Daily Living

Mr. S. argues that the ALJ placed undue weight on his activities of daily living.  Docket No. 9 at 29-30.  The court has already addressed this issue with regard to Mr. S.'s mental RFC in the preceding section and agrees with Mr. S.—

his activities of daily living do not undermine the functional limitations imposed by his mental impairments.

With regard to his physical RFC, the court finds no error.  As indicated previously, Mr. S.'s medical records indicate conservative treatment of his pain has been met with some pretty significant success in alleviating Mr. S.'s pain without surgical intervention or chronic use of any pain medications.  Mr. S.'s limited daily activities are largely the product of his mental impairments.  He frequently stated in writing or testimony that he did not do laundry, housework, or cook because he felt too depressed to do so, not because his pain was insurmountable.

### E.    Type of Remand

Mr. S. requests an outright award of benefits or, in the alternative, reversal of the Commissioner's decision with remand for further development.  See Docket No. 9.  For the reasons discussed above, the Commissioner's denial of benefits is not supported by substantial evidence in the record as to the step four formulation of Mr. S.'s mental RFC and with regard to addressing his hearing loss in formulating the physical RFC.

Section 1383(c)(3) of Title 42 of the United States Code provides that final decisions made by the Commissioner of the Social Security Administration as to Title XVI benefits shall be subject to judicial review under 42 U.S.C. § 405(g).  "Section 405(g) of Title 42, United States Code, authorizes judicial review of 'any final decision of the Commissioner . . . made after a hearing.' "  Efinchuk v. Astrue, 480 F.3d 846, 848 (8th Cir. 2007) (quoting Mason v. Barnhart, 406

F.3d 962, 964 (8th Cir. 2005)).  It "authorizes only two types of remand orders: (1) those made pursuant to sentence four, and (2) those made pursuant to sentence six." Buckner v. Apfel, 213 F.3d 1006, 1010 (8th Cir. 2000) (citing Melkonyan v. Sullivan, 501 U.S. 89, 98-99 (1991)).  A sentence four remand "authorizes a court to enter 'a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing.' " Id. (quoting 42 U.S.C. § 405(g)).

"A sentence four remand is therefore proper whenever the district court makes a substantive ruling regarding the correctness of a decision of the Commissioner and remands the case in accordance with such a ruling." Id.  A sentence six remand is authorized "in only two limited situations: (1) where the Commissioner requests a remand before answering the complaint . . . or (2) where the new and material evidence is adduced that was for good cause not presented during the administrative proceedings." Id.  Neither sentence six situation applies here.

A sentence four remand is applicable in this case.  Remand with instructions to award benefits is appropriate "only if the record 'overwhelmingly supports' such a finding." Id. at 1011 (quoting Thompson v. Sullivan, 957 F.2d 611, 614 (8th Cir. 1992)).  "[W]hen a claimant appeals from the Commissioner's denial of benefits and we find that such a denial was improper, we, out of 'our abundant deference to the ALJ,' remand the case for further administrative proceedings." Id. (quoting Cox v. Apfel, 160 F.3d 1203, 1210 (8th Cir. 1998)).

In this case, reversal and remand is warranted not because the evidence is overwhelming, but because the record evidence should be supplemented, clarified, and/or properly evaluated under the applicable law.  See also Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 356 (7th Cir. 2005) ("[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability.").  Therefore, a remand for further administrative proceedings so the ALJ can address these issues is appropriate.

## CONCLUSION

Based on the foregoing law, administrative record, and analysis, it is hereby

ORDERED that the Commissioner's decision below is reversed and this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for reevaluation of the evidence at step four as outlined in this opinion.

DATED this 15th day of October, 2025.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge

46